## APPEAL OF PENINSULA SHIPBUILDING CO.

Docket No. 5741. Promulgated December 8, 1926.

During the years 1918, 1919, and 1920, the petitioner was engaged in building wooden ships for the United States Shipping Board Emergency Fleet Corporation on a cost plus fixed fee basis, the contracts under which the work was being done providing that depreciation of plant and equipment was to be considered an element of cost. *Held*, that the petitioner was not entitled to deduct from gross income, in its tax returns for the years 1918, 1919, and 1920, amounts for amortization of property which were reimbursed to the petitioner in 1923.

*Charles E. McCulloch, Esq.*, and *Stiles W. Burr, Esq.*, for the petitioner.

*Ward Loveless, Esq.*, for the Commissioner.

This is an appeal from the determination of deficiencies for the years 1918, 1919, and 1920, in the respective amounts of $26,576.12, $68,055.93, and $23,074.65. The petitioner admits an aggregate deficiency of about $12,000. The one issue presented is whether the petitioner is entitled to deduct from gross income, in income-tax returns for the years 1918, 1919, and 1920, an aggregate amount of $235,126.27 for obsolescence or amortization of plant, or whether that amount should be reduced by $149,763.01, which was reimbursed to it by the United States Shipping Board Emergency Fleet Corporation to cover such obsolescence or amortization. It is the contention of the petitioner that it is entitled to deduct the full amount of $235,126.27 and that the receipt of $149,763.01 in 1923 constituted the receipt of taxable income for that year.

FINDINGS OF FACT.

Petitioner is a corporation organized under the laws of Oregon with its office at Portland. It was organized in 1916 for the purpose of building small wooden vessels as a private enterprise and was so operated until May 15, 1917. On that date it entered into the first of three contracts with the United States Shipping Board Emergency Fleet Corporation for the construction of wooden ships for the Government. The shipbuilding facilities of the plant at that time consisted of two "ways"; that is, facilities for the construction of two ships at a time, and represented a capital expenditure of $110,116.04.

The first contract, above referred to, known as Contract 5-W. C., provided for the construction of four wooden vessels, to be completed under specifications approved by the Emergency Fleet Corporation, the first by February 15, 1918, and the remaining three—one every thirty days thereafter. Pertinent portions of this contract read as follows:

[Art.] II.

[Par. 2] For the purpose of this contract, the actual cost shall be generally as defined in the United States Revenue Bill of September 6th, 1916, Section 302, insofar as the requirements of said Revenue Bill are applicable to and not inconsistent herewith.

[Par. 3] The actual cost shall include the following and items similar thereto in principle, *provided* that all items of overhead or indirect cost included in paragraphs (b) to (e) of this article and *all items under paragraphs (f) and (g) shall, as far as possible, be submitted to the Owner in advance for its approval, and no item so submitted in advance and disapproved by the Owner shall be payable to the Contractor.* (Italics ours.)

*       *       *       *       *       *       *

(f) A reasonable allowance, according to the conditions, for depreciation of values of plant and property (account being taken of exceptional deprecia-

tion of extensions, increases, and additions to plant and property specially acquired for or devoted to the manufacture or erection of the work or the construction of the vessel under this contract provided the same have not been paid for by the Owner under (g)).

(g) The cost of labor materials machinery equipment and supplies (other than real estate) for the establishment of and extensions increases and additions to plant and property of the Contractor authorized by the Owner specially acquired for or devoted to the building or construction of the vessels under this contract and rentals actually paid for such establishments extensions increases and additions authorized by the Owner.

      \*          \*          \*          \*          \*          \*          \*

[Par. 5] Physical property represented by items of cost included in paragraph (g) *supra* paid for by the Owners shall continue to be Owner's property after termination of this contract, but may be purchased by the Contractor at such termination at a value to be agreed upon.

      \*          \*          \*          \*          \*          \*          \*

Determination of cost.

The determination of the actual cost as above defined shall be made by and under the direction of George W. Goethals as General Manager of the Owner or his successors in such office (herein called the General Manager) and his decision shall (except as hereinafter stated) be binding on both parties. Wherever possible, he will lay down in advance the methods to be followed in ascertaining and determining the actual cost, and where this cannot be done, will act on claims submitted by the Contractor. He will determine methods to be followed by the Contractor in preparing bills and by engineers and auditors in certifying to them, and will determine the items which must be referred for his decision. He will so far as possible determine in advance the ratio of amortization referred to in paragraph (f) *supra*, and allowances to be made for indirect charges.

      \*          \*          \*          \*          \*          \*          \*

### [Art.] III.

      \*          \*          \*          \*          \*          \*          \*

Orders.

The Owner shall have full control of all orders for materials, machinery equipment supplies and other purchases and commitments made under this agreement (including establishment of extensions increases and additions to plant and property) and all contracts and orders placed by the Contractor may be in the name of the Owner by the Contractor as agent, and it is understood that the Contractor shall assume no pecuniary liability under or by reason of such obligations where made with the written approval of the Owner.

The number and class of men engaged on the work (including establishment of extensions increases and additions to plant and property), the hours of labor, methods of work and terms of employment shall be subject to the approval and direction of the General Manager of the Owner.

      \*          \*          \*          \*          \*        ·  \*          \*

### [Art.] VIII.

Disputes.

If any doubt or dispute arises as to the meaning or effect of this contract, or the drawings or specifications which are a part hereof, or if any discrepancy occurs, the matter shall be promptly referred to the General Manager and his decision in the premises shall be conclusive and binding upon both parties.

In case after delivery of a completed vessel to the Owner under this contract (but only in that event) the Contractor shall deem that it is aggrieved by any decision of the General Manager either as to actual cost or as to any disputed matter hereunder of any kind and shall give notice to the Owner to that effect within thirty days after delivery or after final payment by the Owner, such matter shall be determined by a Board which shall consist of three naval architects or engineers or experts to be appointed, one by the Owner, one by the Contractor, and one by the American Bureau of Shipping. Such Board shall within thirty days after submission of such matter to it determine what if any further sum shall be due by the Owner to the Contractor hereunder on account of such delivered vessel and its finding (made by a majority of the Board) shall be conclusive on both parties.

The second contract, known as Contract 172–W. C., dated December 15, 1917, carried substantially the same provisions as Contract 5–W. C., and called for the delivery of four ships, the first by November 1, 1918, and the remaining three—one every thirty days thereafter. The pertinent provisions of this contract are as follows:

### [Art.] I.

* * * Said vessels are to be constructed under the terms of said contract dated May 15, 1917, and payment therefor is to be made under the terms of said contract, which contract is to govern in all respects in the construction of said vessels and is to be binding upon the parties hereto as if fully set out herein, except in the following particulars:

1. The Contractor agrees to deliver said completed vessels to the Owner afloat at the works of the Contractor at Portland, Oregon, on or before the following dates:

One vessel to be delivered on or before November 1, 1918; and the remaining three vessels to be delivered—one every thirty (30) days thereafter. All four (4) vessels, however, to be delivered prior to February 1, 1919.

2. The 5th paragraph of Article II, relating to the purchase of physical property represented by items of cost included under subdivision (g) of the 3d paragraph of Article II, is eliminated, and in lieu thereof the following is substituted:

The Contractor agrees to purchase and pay for, from its own funds, any real estate or other improvements to the plant authorized by the Owner, providing any are necessary for the construction and completion of the vessels herein contracted for. The Owner agrees to allow the Contractor for the use of said improvements and plant, as a part of the cost of constructing the vessels, at the rate of thirty per cent. (30%) per annum depreciation (exclusive of the cost of grading); if any further additions to plant or equipment are necessary for the construction of the vessels under the contract of May 15, 1917, the Contractor is to pay for the same from its own funds, and the Owner is to allow as part of the cost of constructing the vessels at the rate of thirty per cent. (30%) per annum depreciation upon the plant and equipment so purchased by the Contractor.

3. The 11th paragraph of Article II, relating to payment, is amended to read as follows:

No payment shall be made except upon such certificates as the Owner may from time to time require. Final approval of such certificates by the Owner shall be necessary for the payments.

4. The second paragraph of Article III entitled "Orders" is amended to read as follows:

The Owner shall have full control over all orders for material, machinery, equipment, supplies, and all other purchases and commitments made under this contract (including the establishment of extensions, increases and additions to plant and property); and all contracts and orders placed by the Contractor shall be first submitted to the Owner for its approval. Any contracts or orders placed by the Contractor, which have not been first approved by the Owner, shall, in no way, be binding upon the Owner, and the Contractor shall be solely liable therefor.

\*        \*        \*        \*        \*        \*        \*

### [Art.] IV.

\* \* \* and PROVIDED FURTHER, That the Owner may, without prejudice to the rights of the Contractor, reserve his decision upon any or all claims for extension until the completion of the vessel, the work in the meantime not to be discontinued or delayed on account thereof. In the event that parties shall not agree as to such extension, such extension shall be determined in accordance with Article VIII of the contract of May 15, 1917.

\*        \*        \*        \*        \*        \*        \*

### [Art.] VII.

The Contractor agrees immediately to make a complete inventory of its yard and plant and to submit a complete list of all purchases made to date. And the Contractor further agrees that no new purchases shall be made without proper authorization of the Owner; that when said inventory is submitted that the Contractor will submit therewith, in writing, a complete list of all improvements for which the Contractor claims depreciation as a part of the cost, together with full details of each and every item upon said list.

The third contract, known as Contract 437–W. C., was similar to the preceding contract and called for the completion and delivery of four more vessels—the first by April 1, 1919, and the remaining three—one every thirty days thereafter.

Under each contract the builders were guaranteed a profit of $40,000 per vessel. Work under the first contract was begun immediately after its execution. It was necessary in the beginning to make extensive additions to the plant. In order to carry on the construction of four vessels simultaneously the plant had to be enlarged to a four "way" plant. The periods over which these additions were made and the costs thereof were billed as follows:

| Period. | Amount. |
|---|---|
| April 6, 1917, to December 31, 1917 | $87,252.55 |
| Jan. 1, 1918, to November 14, 1918 | 59,228.99 |
| Total additions to November 14, 1918 | 146,481.54 |
| Nov. 14, 1918, to December 31, 1918 | 27,227.77 |
| Jan. 1, 1919, to December 31, 1919 | 11,462.32 |
| Jan. 1, 1920, to June 30, 1920 | 8,167.58 |
| Total additions to June 30, 1920 | 193,339.21 |

One vessel had been completed and delivered and the other eleven were in various stages of construction when the Armistice was signed. Soon thereafter, notice to suspend work on the unfinished vessels was issued and the contracts declared canceled. Later the contracts were extended so as to allow completion of all twelve of the vessels, the specifications for the last two being changed to provide for saving equipment and the price therefor being reduced from a profit of $40,000 to a profit of $20,000 on each. All the work was completed in 1920 and the plant shut down in that year. In 1921 it was sold for $30,000, which was its salvage value. Both the petitioner and the Emergency Fleet Corporation had realized when work on the Government contracts was begun that the shipyards would have only a salvage value after the completion of the Government contracts.

Although amounts spent by the petitioner for additions to plant from April 6, 1917, to June 30, 1920, aggregated $193,339.21, only a small portion of these expenditures was ever approved in advance by the Emergency Fleet Corporation. Repeated requests for such approval were made to the district representatives of the Emergency Fleet Corporation and to headquarters in Washington, D. C., but they were for the most part denied. The petitioner made claims for depreciation on unauthorized additions to plant and continued to make claims therefor until it obtained final settlement under its contracts in 1923.

Under date of May 28, 1917, F. C. Knapp, president of the petitioner, received a letter from George W. Goethals, general manager for the Emergency Fleet Corporation, which provided in part as follows:

As regards the depreciation for the cost of the plant it is understood that this is based on your expression that upon the conclusion of contracts for the Emergency Fleet Corporation there will be no profitable business remaining for your company, and that, therefore, the entire cost of the plant will have to be absorbed within practically three or four years from the time it was purchased. This, of course, is a matter which is subject to adjustment upon the conclusion of the corporation's contract in case the conditions at that time do not accord with your expectations, as stated hereinabove.

The Emergency Fleet Corporation allowed during the years 1918, 1919, and 1920, as depreciation or obsolescence of plant in computing the cost of the twelve vessels under the terms of the contracts, a total of $50,236.99. The total claimed for plant depreciation from the Emergency Fleet Corporation amounted to $249,012.53. This claim was adjudicated by the Claims Commission of the United States Shipping Board on February 3, 1923, and was allowed for a total amount of $200,000, less $50,236.99 theretofore allowed. The additional payment made to the petitioner in 1923 was $149,763.01.

The petitioner kept its books of account on the accrual basis. It reported the $50,236.99, allowed by the auditors as obsolescence of plant from November 14, 1918, to June 30, 1920, as having accrued—$3,100.66 in 1918, $27,998.58 in 1919, and $19,236.75 in 1920. These amounts were included in the gross income shown on the income-tax returns filed for those years. No part of the claim against the Emergency Fleet Corporation for additional depreciation or obsolescence not approved by the district auditors was set up as accrued income on the petitioner's books for the years 1918, 1919, and 1920.

In his computation of tax liability for the years 1918, 1919, and 1920, the Commissioner allowed the deduction of $17,999.53 for depreciation for the year 1917. He determined that the depreciated cost of the plant and facilities as of November 14, 1918, was $218,268.60. To the depreciated cost as of that date the Commissioner added the cost, as determined by him, of the additions made to the plant over the period November 14, 1918, to June 30, 1920, amounting to $46,857.67, giving a total of $265,126.27. That amount less salvage, $30,000, the Commissioner allowed as obsolescence for 1918, 1919, and 1920, in the amounts of $16,754.36, $146,625.91, and $71,746, respectively.

In his audit of the petitioner's returns for the years 1918, 1919, and 1920, the Commissioner added to the gross income reported by the petitioner, $8,948.34 for 1918; $83,467.42 for 1919; $57,347.25 for 1920, the sum of these being the additional amount for depreciation received by the petitioner in 1923 from the Emergency Fleet Corporation in compromise of its claim for plant depreciation. This amount was apportioned to the income over the three years in the same ratio that the $50,236.99 depreciation allowed by the Emergency Fleet Corporation was apportioned to the deduction.

OPINION.

SMITH: This appeal presents the question of the proper treatment to be accorded an amount of $149,763.01 representing depreciation on the petitioner's plant, which was paid to it in 1923 by the United States Shipping Board Emergency Fleet Corporation under certain contracts between the corporation and the petitioner. The contracts giving rise to the claim for the amount provided that depreciation should be an element in determining the cost of the ships to be built by petitioner whereby the United States was to pay the cost of the construction of the ships plus a fixed fee. The amount was allowed by the Emergency Fleet Corporation in 1923 specifically as " depreciation." The Commissioner in determining the deficiency has called the entire allowance for depreciation " obsolescence."

The applicable provisions of the taxing statute are as follows:

That in the case of a corporation subject to the tax imposed by section 230 the term "net income" means the gross income as defined in section 233 less the deductions allowed by section 234, and the net income shall be computed on the same basis as is provided in subdivision (b) of section 212 or in section 226. (Section 232, Revenue Act of 1918.)

(b) The net income shall be computed upon the basis of the taxpayer's annual accounting period * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * * (Section 212, Revenue Act of 1918.)

(a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

*        *        *        *        *        *        *

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence;

(8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income. * * * (Section 234, Revenue Act of 1918.)

We think that it is immaterial that the allowance was designated by the Emergency Fleet Corporation as depreciation and by the Commissioner as obsolescence. It meets all the tests of the allowance provided by the statute for amortization, and we think that subdivision (8) of section 234 of the Revenue Act of 1918, above quoted, is applicable.

Deficiencies before us relate to the years 1918, 1919, and 1920. In his deficiency letter the Commissioner has related the $149,763.01 received by the petitioner in 1923 back to the years 1918, 1919, and 1920, and has apportioned the amount to the three years in the same ratio as the $50,236.99 allowed as depreciation by the Emergency Fleet Corporation was apportioned. No question is raised by this appeal as to the correctness of this allocation provided the $149,763.01 is to be considered as in anywise affecting the tax liability for the years 1918, 1919, and 1920.

In his deficiency letter the Commissioner increased gross income for the years 1918, 1919, and 1920, by the $149,763.01 in question, apportioned as above indicated. At the hearing counsel for the

Commissioner admitted that this was in error, and contended that the gross income should not have been increased but that the allowance for obsolescence or amortization should have been reduced in like amount, and that the net incomes, as shown by the deficiency letter, were correct.

We think that the position of the Commissioner with respect to this matter is correct. It is thoroughly in line with the reasoning of the Board in the *Appeal of G. M. Standifer Construction Corporation*, 4 B. T. A. 525, where a different conclusion was reached solely for the want of such facts as are here presented. In that appeal the award from the Emergency Fleet Corporation was a lump sum settlement of a great many totally dissimilar claims, to which no allocation of the award was attempted in the settlement agreement, or was possible thereafter. We find the following language in the opinion:

Whether the Government contracts under which a taxpayer produced articles contributing to the prosecution of the war specifically provided for amortization as such or, in other words, provided that the Government would pay the cost, or any part thereof, of the facilities acquired or constructed by a taxpayer in order to carry out the contracts, seems to us to be not controlling. The real question is: Did the Government actually pay or bear the expense of any part of the cost of such facilities? If it did, such part of the cost borne by the Government must be subtracted from the cost of facilities acquired by the taxpayer upon which the amortization deduction is allowed. There is no deduction allowed to a taxpayer with respect to such part of the cost of facilities which was not borne by him. Whether such cost of facilities was actually borne by the Government originally when the facilities were acquired, or whether it was borne by the Government subsequently when the settlements of the contracts were made between the Government and the taxpayer, is immaterial. We believe that the contention of the Government in this regard, as a matter of law, is well founded, but whether such principle is applicable to the facts in this case presents more difficulty

\*        \*        \*        \*        \*        \*        \*

It does not necessarily follow that, because the Standifer Corporation made a claim for reimbursement of a part of the cost of facilities, any part of such claim was allowed in the final lump sum settlement. The taxpayer filed claims exceeding $11,000,000. Included therein were damages for breach of contract, settlement for facilities, and various other claims. \* \* \*

From a consideration of all the evidence, we are of the opinion that no part of the cost of the facilities on which amortization is allowable can be considered to have been borne by the Government, and that the taxpayer is entitled to the deduction for amortization without reduction of the cost of facilities by any part of the amount of the settlement with the Fleet Corporation.

In the case before us, the claim was for a specific amount for depreciation of property as an element of cost of the ships, and that claim was allowed for $200,000, less $50,236.99 theretofore allowed.

The contentions of the petitioner that the claim against the Emergency Fleet Corporation had no determinable value during the years 1918, 1919, and 1920, that under a strict legal construction of the contracts no recovery could ever have been had, and that the petitioner never accrued any amount in respect of the claims on its books, are either not proven or are not material. The fact is that an amount representing depreciation with the identical status of that previously determined as a part of the cost of the vessels was actually received. We believe that time is not of the essence, and that the additional amount received in 1923 was a part of the cost of construction of the plant not borne by the petitioner and is not deductible as depreciation, obsolescence, or amortization under the Revenue Act of 1918.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

MILLIKEN and VAN FOSSAN not participating.